IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

REYNOLD ROEDER,

                        Plaintiff,                        CV-05-1578-ST

        v.                                    OPINION AND ORDER

PACIFICORP FINANCIAL SERVICES, INC., an
Oregon corporation,

                       Defendant.             

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Reynold Roeder ("Roeder"), is a former employee of defendant, Pacificorp

Financial Services, Inc. ("PFS"), an Oregon corporation duly incorporated and existing under the

laws of the State of Oregon, with its principal place of business in Multnomah County, Oregon.

Roeder contends that PFS breached various contracts by failing to pay him promised

retirement benefits, long-term incentive plan benefits, and an annual bonus (First Claim).  He

also alleges that PFS' failure to pay constitutes a violation of ORS 652.140 (Second Claim), and

is willful, entitling him to an enhanced sum to be established at trial under ORS 652.150(2). PFS removed the action to this court on the ground that the claim alleging breach of contract for severance benefits falls under the Employee Retirement Income Security Act ("ERISA"), 29 USC § 1144. The court has original jurisdiction over the ERISA claim under 28 USC § 1331 and supplemental jurisdiction over the state law claims under 28 USC § 1367.

Both parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket # 32).

PFS has filed a Motion for Summary Judgment on all claims (docket # 24) on the grounds that some of the contracts alleged in the Complaint were never formed, while others were formed but never breached by PFS. As a consequence, PFS contends that it does not owe Roeder any money and, therefore, has not violated ORS 652.140.

For the reasons that follow, PFS' Motion for Summary Judgment is denied as to the claims for severance benefits and the claim for promissory estoppel as to the LTIP, but is otherwise granted.

## LEGAL STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party."  *Id* (citation omitted).  Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party.  *Id* at 631.

## FACTUAL BACKGROUND

A review of the parties' submissions, including affidavits, declarations, and deposition excerpts, reveals the following facts.[1]

Roeder began working for PFS in late 1990 as an assistant controller and became a PFS vice president in approximately 1996.  Roeder Depo., pp. 11-12; Roeder Decl., ¶ 2.  PFS is a wholly-owned subsidiary of PacifiCorp Holdings, Inc., which, in turn, is a wholly-owned subsidiary of PacificCorp ("PacifiCorp").  Longfield Depo., p. 41.

In mid 1996, Covol Technologies, Inc. ("Covol"), wanted to involve PacifiCorp in a synthetic coal plant that was in the early stages of construction in Alabama.  Roeder Decl., ¶ 5. Roeder and other PacifiCorp personnel recognized that the plant could produce tax credits that might result in millions of dollar-for-dollar reductions in the amount of taxes paid by PacifiCorp.

---

[1]  Both parties have submitted documents with various attachments.  Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit, declaration or page(s) of the deposition transcript.  All other citations are to the exhibit number of the parties' submissions.

Roeder Depo., pp. 17-18; Roeder Decl., ¶¶ 12-14.  The IRS requirements for obtaining the tax credits were substantial, including demanding timelines for commencement of construction and completion of the plant.  Roeder Depo., p. 79.

Roeder brought this opportunity to PFS and PacifiCorp, and they agreed in the fall of 1996 that PacifiCorp would acquire one of the Covol plants under construction in Birmingham, Alabama.  Roeder Decl., ¶ 14.  In September and December 1996, Birmingham Syn Fuel LLC and PacifiCorp Syn Fuel LLC were organized as separate, wholly owned subsidiaries of PFS.  Allen Affidavit, Exhibits 3 & 4.  Roeder was designated as president of PacifiCorp Syn Fuel LLC ("Syn Fuel").  Roeder Depo., pp. 17, 55-56.[2]

On February 21, 1997, the PFS Board adopted the PFS Executive Severance Plan ("Severance Plan"), which listed Roeder and Longfield as its two beneficiaries.  Buchanan Decl., Exhibit 9.  In April 1997, the PFS Board implemented the short-term annual bonus plan called the Target Achievement Plan.  Roeder Depo., p. 118 & Exhibit 15.  In 1997 and 1998, Roeder received annual bonuses under this plan.  *Id* at Exhibit 18.  The plan required that the participant be actively employed by PFS on December 31 of the plan year to receive the bonus.  *Id* at Exhibit 15.

Roeder worked to obtain a private letter ruling from the IRS approving the significant chemical changes to the coal and the validity of the binding construction contract and thus qualify Syn Fuel for the tax credits.  Roeder Depo., pp. 78-81.  The IRS issued the private letter ruling approving the tax credits in August 1997.  Longfield Depo., pp. 74-75.  This was the

---

[2] It is unclear from the parties' submissions what role, if any, Roeder had at Birmingham Syn Fuel LLC.

pivotal point in the decision by PFS and PacifiCorp to increase their investment in this industry. Roeder Decl., ¶ 18.

Roeder's employment responsibilities vastly increased with the building, opening, and managing of three more Syn Fuel plants in Alabama. Roeder Decl., ¶¶ 30, 37. At Syn Fuel's inception, Roeder was the only employee working on any Syn Fuel project. Roeder Depo., p. 18. By the time he left in November 1999, Syn Fuel had a total of 45 employees, most of them in Alabama. *Id.* According to Longfield, Roeder did an "exceptional" job in his creation and management of the Syn Fuel project. Longfield Depo., pp. 69-70.

PFS had a policy that all nonregulated operations would have a long term incentive plan ("LTIP") in place in order to "change the entity from a mentality of regulated operations to one of nonregulated." Roeder Depo., p. 57. Part of that process was to pay employees at market rates. *Id.* Roeder was involved in developing LTIPs for two other PFS ventures, EnergyWorks and INSPECT. *Id* at 58.

After the IRS issued a favorable private letter ruling in August 1997, Henderson and Longfield separately discussed with Roeder the implementation of a LTIP for his benefit. Roeder Depo., pp. 69-72. In November 1997, Roeder drafted a LTIP proposal for Syn Fuel (called "Executive Profit Sharing Plan") based on the Energy Works LTIP plan and sent it to Longfield. *Id* at 50-54, Exhibit 4; Roeder Decl., ¶ 29. The proposal contained recommendations for compensation and benefit schemes for various levels of employees at Syn Fuel, including a profit sharing pool for six executives, with Roeder as the largest beneficiary at 40 % of the pool. *Id.* He did not receive a response to the LTIP proposal. Roeder Decl., ¶ 33.

In discussions about the proposed LTIP, Longfield told Roeder to "go back and work hard." Roeder Depo., p. 69. Roeder understood the deal to be that if "I go work hard; I build huge value for the company; they're going to pay me for it." *Id*. Longfield also told Roeder the proposed LTIP "looked good to [him].[3] Go talk to Lea Ann Doolittle." *Id* at 70. Lea Ann Doolittle ("Doolittle") worked in PacifiCorp's Human Resources Department in charge of executive compensation issues. Longfield Depo., p. 132. Roeder sent Doolittle an email, then asked her about the proposed LTIP when he ran into her in the elevator lobby. Roeder Depo., p. 70. She answered: "[i]t looks like you could make a lot of money under plan." *Id*. In response, Roeder stated: "[w]ell, that was the idea, that the company made a lot of money; I can make a lot of money." *Id*. He could not remember what else, if anything, Doolittle said to him and admits they never had a formal meeting about the proposed LTIP. *Id* at 70-71. He pointed out there was a "continuing theme" in that he "didn't get much of a response from anybody with respect to any portion of [his] compensation," which led to a lot of uncertainty. *Id*. When asked what kind of promise Henderson made, Roeder answered:

> I spoke to Mike [Henderson] about the venture and about the compensation plans that we were putting in place. And one key piece of it for me was the [LTIP Roeder had proposed] or a chance to earn the EnergyWorks - like the long-term incentive plan stuff that we had talked about. Because he and I were working on the EnergyWorks joint venture. And he confirmed that was consistent with what we were going to do.

*Id* at 71.

---

[3] The actual record contains what appears to be a typographic error: "looked good to limb." Roeder Depo., p. 70.

He did not remember Henderson's exact words, nor the exact dates of these conversations. *Id* at 71-72.[4]

Relying on what he believed were promises by Longfield and Henderson that a LTIP would be implemented for Syn Fuel, Roeder "fully engaged in the Syn Fuel projects." Roeder Decl., ¶ 29. He understood that the market rate of the salary and benefits he was being offered on an annual basis was far below the job responsibilities that PFS was asking him to fulfill by leading the Syn Fuel project, but was willing to "make the personal sacrifice and receive under market compensation, expressly because of the concept that [he] would be rewarded with a LTIP plan similar to the LTIP plans that PacifiCorp had adopted for other ventures." *Id* at ¶¶ 26-27.

In a 1998 letter offering J. R. Key a job as a manager for the Syn Fuel plants, Roeder included a description of the LTIP as part of the compensation package, with the following limitation:

> You will be included in any PacifiCorp Syn Fuel, LLC Executive Profit Sharing Plan which is currently being developed and discussed. *The plan remains subject to board approval, and its final terms have not yet been determined.* Additionally, the participation percentage awarded to you, if any, under this plan has not yet been determined.

Roeder Depo., Exhibit 16 (emphasis added).

Roeder believed the Board members were "on board in concept" to approve his LTIP proposal since two of the three PFS board members, Longfield and Henderson, had made him

---

[4] At oral argument, Roeder relied on statements he made in his declaration as evidence that both Longfield and Henderson made specific promises to him that a Syn Fuel LTIP would be implemented. *See* Roeder Decl., ¶¶ 23, 28, 33, 34, 41. The court notes that these statements are general and much broader than Roeder's deposition on the subject. To the extent these statements contradict his deposition, they are not considered.

promises to that regard.  Roeder Depo., pp. 82-83.[5]  The third member of the Board, Dick

O'Brien, had never made him any promises about the LTIP.  *Id* at 83-84.  O'Brien remembers

discussions about a profit sharing plan for Syn Fuel, but:

> [o]nly in the broadest context.  You know, we -- we felt like we probably
> should put something in place for those people who stuck it out long
> enough to, you know, ultimately get value from the business, however we
> were going to do that.
> But, you know, I don't know that we had decided the right form of that; you
> know, whether it should a be long-term plan specifically for Syn Fuel's business
> or whether it should be, you know, stock or, you know, some other way to
> compensate people and really try to tie the performance of the business to their
> success and to the company's success.
> So,  you know, other than broad discussions like that, again, I would have really -
> - as I recall, I really would have had Craig [Longfield] and Mike [Henderson]
> work on that stuff, it wasn't really my bailiwick."

O'Brien Depo., pp. 46-50.

O'Brien admitted that his "normal path" would have been to defer any Roeder

compensation issues to Longfield, who was Roeder's boss, "and to the extent that [Longfield]

had any issues, [O'Brien] would have made sure that he was referred to Leanne Doolittle."  *Id* at

56.

Longfield was not willing to recommend approval of the LTIP for Syn Fuel to the Board

"until such time as the performance of the Syn Fuel operation was consistent with what we had

told the board we would be capable of doing."  Longfield Depo., pp. 110-11.  Furthermore, he

was not prepared to make the recommendation "without significant discussions as to [the] kind

of the specific characteristics and attributes of what [Roeder] had recommended."  *Id* at 126-27.

---

[5] Henderson left the PFS Board sometime between late 1997 and early 1999, leaving just two Board members, Longfield and O'Brien.  Longfield Depo., p. 42.

He was interested in getting a LTIP adopted for the Syn Fuel business "at the appropriate time," but "the timing and nature of the deal were very much up in the air." *Id* at 128.

In December 1998, PacifiCorp announced that it had entered into an agreement for a merger of the entire PacifiCorp family of companies with a subsidiary of Scottish Power. O'Brien Depo., p. 26. In 1999, shareholder and regulatory approval was obtained. *Id* at 27. By October 1999, it was Longfield's understanding that the merger was going to occur. Longfield Depo., p. 60. The pending merger caused a high degree of uncertainty for everyone. *Id* at 105-06.

In July 1999, Roeder received a job offer from another company, LECTRIX, for the position of CFO. Roeder Depo., pp. 15, 27-28; Roeder Decl., ¶ 45. He was not very interested in the position because it would involve relocation to San Francisco. Roeder Depo., p. 16. In a July 14, 1999 email, Roeder informed Longfield that he was considering another job offer and was trying "to get some certainty" on matters that were "uncertain in [his] mind at the time." *Id* at 27-28. Longfield did not respond and referred the matter to Human Resources. *Id* at 29. When he could not get a response to the email, it became apparent to Roeder that "a deal [he] thought [he] had might not be a deal." *Id* at 72. The only response Roeder eventually received to his July 14, 1999 email was a September 1999 retention letter from Longfield. *Id* at 31-32. At the time he received the retention letter, Roeder had not been informed about any PFS Board approval of the LTIP he had proposed. *Id* at 81-82.

The retention letter signed by Longfield offered Roeder a set of new benefits to become effective upon receiving his confirmation of continued employment with PFS. Buchanan Decl., Exhibit 8. Acceptance of the new terms would mean waiving any benefits Roeder might have

been eligible for under the 1997 Severance Plan.  *Id* at 3.  Longfield described the following

long-term incentive opportunity as among the proposed benefits:

> At least equivalent in opportunity value to prior stock options grants
> ($37,320 is approximate annualized value of opportunity).  In the future,
> the form of long-term incentive opportunity may change from stock
> options to some other type of plan with no less opportunity value.  *The
> replacement plan might even be the [LTIP] which you've proposed, but
> the [LTIP] needs further development and consideration before I can
> support approval.*  However, should the [LTIP] be developed and
> approved prior to March 1, 2000, the specific objectives of the [LTIP] will
> be to both provide long-term performance incentives and to serve as a
> retention vehicle.  In this regard, should you receive any  retention award
> as described below, such award will be offset from any payment you
> should receive from the [LTIP] (or its replacement) prior to June 30, 2001.

*Id* at 2-3 (emphasis added).

Longfield represented to Roeder that the merger was definitely going to occur and that he

did not know what would happen to Roeder or anyone else.  Longfield Depo., pp. 105-06.  He

also said that "at one time" Roeder had been considered a potential candidate to head the Fuels

Division, which would have meant relocating to Utah, something Roeder did not want to do.

Roeder Depo., p. 21.  Longfield also talked about the possibility of having Roeder move into

more "PHI [PacifCorp Holdings, Inc.] oriented roles" since Roeder was "doing some of that

already."  *Id*.  He said that everyone was "at risk" and Roeder might get fired.  *Id* at 21-22.  It

was unclear what Scottish Power would do with Syn Fuel.  *Id* at 16-17.

Roeder did not accept the offer in the retention letter, submitted his resignation to

Longfield on October 23, 1999, and left his employment on November 5, 1999.  Longfield

Depo., Exhibit 32; Roeder Decl., ¶ 51.

By the time Roeder left, Syn Fuel "finally reached a point of sustainable after-tax

earnings [over $2.3 million from September through November 1999]" and, even more

importantly, qualified for lucrative tax credits.  Longfield Depo., Exhibit 37; Roeder Decl., ¶¶

40, 47.  However, the Syn Fuel businesses were not performing as expected.  Longfield Depo.,

pp. 95-96 & Exhibit 37.

The merger between PacifiCorp and Scottish Power was finalized on November 29,

1999.  Buchanan Decl., Exhibit 10.  The Syn Fuel businesses never performed as expected, and it

was not until 2001 when the businesses were sold to another company, Marriott Corporation,

that PFS realized significant value from these businesses.  Longfield Depo., pp.  95-97.

Roeder contends that PFS promised but failed to pay him benefits from: (1) the

Severance Plan; (2) the implementation of a LTIP; and (3) the short-term annual bonus program

("Annual Bonus Plan") for 1999.

## DISCUSSION

## I.    Severance Plan

### A.    Applicable Law

According to the Notice of Removal, Roeder's claim for benefits under the Severance

Plan is governed by ERISA.  ERISA subjects employee pension and welfare benefit plans to

federal regulation.  *See Scott v. Gulf Oil Corp.*, 754 F2d 1499, 1501 (9th Cir 1985) (citations

omitted).  Severance pay is an employee welfare benefit plan within the meaning of ERISA.  *Id*

at 1502-03.

ERISA preempts state common-law causes of action when such claims "relate to" any

employment benefit plan covered by ERISA.  29 USC § 1144(a); *Zavala v. Trans-System, Inc.*,

2006 WL 898019 * 2 (D Or April 4, 2006).  Generally, a claim "relates to" an employee benefit

plan covered by ERISA "if it has a connection with or reference to such a plan."  *Providence*

*Health Plan v. McDowell*, 385 F3d 1168, 1172 (9th Cir 2004) (citations omitted).  Accordingly,

this court will construe Roeder's state claims with regard to the Severance Plan as a properly

pled federal claim under ERISA.

While ERISA "does not contain a body of contract law to govern the interpretation and

enforcement of employee benefit plans," Congress intended for the courts to "[borrow] from

state law where appropriate, and guided by the policies expressed in ERISA and other federal

labor laws, to fashion a body of federal common law to govern ERISA suits."  *Scott*, 754 F2d at

1501-02 (citations omitted).

In an ERISA claim, federal contract law is controlling.  A contract must be read as a

whole and each part must be interpreted "with reference to the entire contract."  *Tanadgusix*

*Corp. v. Huber*, 404 F3d 1201, 1205 (9th Cir 2005) (citation omitted).  "The terms of the contract

control, regardless of the parties' subjective intentions shown by extrinsic evidence."  *Id*.

"Where there is no ambiguity in the contract, there is no genuine issue of fact."  *Id* (citation

omitted).  "A contract is ambiguous if reasonable people could find its terms susceptible to more

than one interpretation."  *Id*, citing *Kennewick Irrigation Dist. v. United States*, 880 F2d 1018,

1032 (9th Cir 1989).

## B.    <u>Eligibility for Severance Plan Benefits</u>

The Severance Plan was implemented because PFS was downsizing and wanted to retain

its key executives (Roeder and Longfield) through times of uncertainty.  Roeder Depo., pp. 32-

33.  Its stated purpose was to "[p]rovide severance pay protection to designated key executives in

event of employment termination and significant employment alteration to the detriment of the

executive or during times of significant change (including change of control) as defined below."

Buchanan Decl., Exhibit 9, p. 3.  The Severance Plan provides in pertinent part:

> To qualify for severance benefits, the individual must have terminated employment for one of the following reasons:
>
> <u>Material Alteration in Position</u> - This is a voluntary termination which is a result of: (1) a change in reporting relationship, (2) a material change in authority, or (3) a change in control of the ownership of the company which has a detrimental impact on the executive.
>
> <u>Employment Termination</u> - This is a non-voluntary termination for reasons other than cause, such as termination due to downsizing.
>
> Termination due to normal retirement, death, total disability, or voluntary termination, except as defined above, would not qualify the individual for benefits.

*Id* at 4.[6]

Roeder voluntarily terminated his employment on November 5, 1999, 24 days before the merger between PacifiCorp and Scottish Power was finalized.  The parties disagree on whether Roeder should have been entitled to payment under the Severance Plan.  Roeder believes he is entitled to payment under the Severance Plan because his voluntary termination was a result of both a change in control of the ownership of PFS which had a detrimental impact on him and a material change in his authority.

### 1.    <u>Change in Control</u>

First, Roeder contends that he satisfies the eligibility requirements for payment under the Severance Plan because: (1) there was "a change in control of the ownership" of PFS; (2) which had a "detrimental impact" on him; and (3) he voluntarily resigned as a result of that change in

---

[6] Although the Severance Plan summary provides that "[a]ny plan disputes are subject to arbitration," neither party has requested arbitration.

control.  PFS has refused to pay him severance benefits because a change in control did not

occur with the Scottish Power merger and, even if it did, Roeder did not suffer any detrimental

impact as a result.

### a.    "Change in Control of the Ownership"

PFS contends that even after the merger closed, there was no change in control at PFS.

PFS remained a wholly-owned subsidiary of PacificCorp Group Holdings Corporation.  However,

this argument overlooks the fact that PacificCorp Group Holdings Corporation was a wholly-

owned subsidiary of PacifiCorp which became owned by Scottish Power after the merger.  A

change in control of the entity that owned PFS is sufficient to constitute a change of control of

PFS.

PFS also argues that Roeder is not eligible for payments under the Severance Plan

because he resigned a few weeks before November 29, 1999, when the merger with Scottish

Power closed and the change in control occurred.  Roeder responds that the change in control

had occurred by the time he left PFS, even though the title did not pass until November 29, 1999,

since the Scottish Power acquisition was approved by the shareholders in 1999, received

authorization from federal authorities "shortly thereafter" and the official announcement of the

change in control came on October 26, 1999.

It is clear from the record that no *actual* change of control occurred by the time Roeder

submitted his resignation (October 22, 1999) or its effective date (November 5, 1999).  As

Roeder admitted in his October 22, 1999 letter to Longfield, "[n]o change in control has

occurred; however one is pending."  Longfield Depo., Exhibit 32.  As Scottish Power informed

its shareholders on October 26, 1999, "good progress has been made with the planned merger of

Scottish Power and PacifiCorp," it anticipated the merger to be complete by the end of the year, and a transfer agent for PacifiCorp was designated beginning the week of October 25, 1999. Longfield Depo., Exhibit 21.  While the merger agreement had been signed two years earlier, in November 1997 (*id*), some hurdles to closing the transaction remained, namely the required regulatory approval for the merger by two state utilities commissions and the United States Nuclear Regulatory Commission.  Buchanan Decl., Exhibit 10, pp. 11-12.  Moreover, the document finalizing the merger contained the following language:

> All transactions at the Closing [of the merger, which took place on November 29, 1999] were deemed to have taken place simultaneously and no transaction was deemed to have been completed . . . and no exchange was deemed to have been made until all such transactions had been completed, all documents had been delivered and all exchanges had been made.

*Id* at 14.

Next, Roeder argues that he is entitled to severance payments regardless of when the actual change of control took effect because the Severance Plan does not require him to be employed on the date the change of control occurs.  In support of this contention, Roeder relies on *Wyss v. Inskeep, Jr.*, 73 Or App 661, 668 n6, 699 P2d 1161, 1166 n6, *rev. denied*, 300 Or 64, 707 P2d 582 (1985).  In *Wyss*, a former executive and shareholder brought suit against the corporate employer to recover an unpaid bonus.  The bonus plan had been set up to retain executive personnel as permanent employees and to ensure that they would continue to provide "extraordinary effort and abilities necessary for the successful operation of the company."  *Id* at 664-65, 699 P2d at 1163-64.  Bonuses were awarded at the discretion of the Board (the two officer defendants) and were distributed three times a year.  After disagreements between plaintiff and defendants, plaintiff was asked to leave the company in early December; his

departure was announced to the Board on December 17; he worked until December 31; and he did not receive the third bonus which had been allocated on December 14 but paid on January 1. The court found that because the employer adopted the bonus plan to retain higher-level employees, the plan became part of those employees' contracts if they continued employment with knowledge of the plan's existence. The bonus plan was silent on whether the employee had to be employed on the date of the disbursement, and the plaintiff had worked throughout the entire bonus earning period and was employed on the date of the bonus allocation. As a result, the court concluded that the jury could have found that defendants breached their contractual good faith duty to pay him a bonus.

*Wyss* presented quite different facts involving a plaintiff who was still employed at the time of the bonus allocation, just not at the time of the disbursement, and had performed his part of the contract by working during the entire bonus earning period. By contrast, Roeder's Severance Plan is only triggered by an employee's voluntary resignation based on three circumstances, among them "a change in control of the ownership of the company which has a detrimental impact on the executive." Unlike *Wyss*, the question here is *when* the Severance Plan is triggered.

Roeder urges the court to interpret "a change in control" broadly to encompass an anticipated or imminent change in control or, at the very least, to find the phrase ambiguous and, therefore, a factual issue for the jury to resolve. PFS responds that if the parties intended to include anticipated changes in control, they could have easily done so by adding the word "anticipated" to the Severance Plan. Unless the Severance Plan is limited to an actual change in

control, PFS argues that it would give key executives an incentive to leave whenever they become concerned about a future change in control.

Roeder's interpretation is not inherently unreasonable.  It would give key executives an incentive to stay until a change of control is very close to completion, rather than jumping ship after the first rumor of a change in control.  As stated by the Severance Plan, its purpose is to "[p]rovide severance pay protection to designated key executives in event of employment termination or significant employment alteration to the detriment of the executive or during times of significant change (including change in control) as defined below."  Buchanan Decl., Exhibit 9, p. 3.  The fact that a merger is imminent, as it was in October and November 1999, may well be a time of "significant change."  If so, then a key executive faced by a detrimental impact from an imminent merger should be able to voluntarily resign with severance pay protection before the actual merger occurs.  By the time a change of control is imminent, a key executive has served his purpose by remaining at his post until that point.  When he sees the handwriting on the wall, he should not be forced to wait while passing up some other employment opportunity in the interim.

Because "a change in control" is subject to two reasonable interpretations, it is ambiguous.

### b.    **"Detrimental Impact"**

Even if Roeder's interpretation is correct, he is not entitled to the benefits of the Severance Plan unless the imminent change in control had "a detrimental impact" on him.  PFS argues that while Roeder may have been unhappy with the uncertainty about what impact the future merger might have on him if he were to stay, he did not suffer an actual impact,

detrimental or not, as a result.  In fact, PFS believes it is possible the merger would have had no impact on Roeder for an extended period of time.

With the benefit of hindsight, PFS is correct.  Scottish Power maintained the Syn Fuel businesses until mid October 2001, at which time it sold them to Marriott.  Roeder's successor, J. R. Key, remained with PFS for more than a year and a half and stayed with Syn Fuel after it was sold to Marriott.  Longfield Depo., p. 114.  On the other hand, Roeder believed that his job might have suffered after the merger.  Longfield said it was unclear what Scottish Power would do with Syn Fuel, everyone was at risk, Roeder might get fired, and at one time Roeder had been considered as a potential candidate to head another division in Utah.  As Roeder described it, "Craig [Longfield] could give me no assurances as to what my future would be beyond a few months."  Roeder Depo., p. 40.

However, Longfield never spoke to anyone at Scottish Power about Roeder's Severance Plan or the job offer he made to him.  Longfield Depo., pp. 109-10.  Thus, at best, Roeder's uncertainty about his future with Scottish Power was entirely speculative and not based on any objective information.  As a result, he did not know, but only guessed, that the merger would have a detrimental impact on him.  That type of subjective belief alone does not rise to the level of detrimental impact.

Roeder also contends that he suffered a detrimental impact from the imminent change of control when Longfield allegedly repudiated his existing employment contract by making him another job offer.  The offer provided that in consideration of continued employment, Roeder would have to forfeit any rights he had under the Severance Plan and accept a new severance plan which Longfield only vaguely outlined.  As a result, Roeder concluded that "[s]uddenly . . .

everything was off the table," the LTIP deal was not being put into writing, and the Severance

Plan was "going away." Roeder Depo., pp. 40-41. Roeder viewed that change as having a

detrimental impact on him.

The offer of a new compensation package by PFS provided far less compensation than

Roeder expected as a result of his efforts. However, Roeder did not accept that offer. Instead,

he elected to retain his rights under his old compensation package, including the Severance Plan,

and left. The primary reason he left was his realization that PFS would not adopt his proposed

LTIP. If PFS decided not to adopt the proposed LTIP because of the pending merger, then

Roeder did resign as a result of the imminent change of control which had a detrimental impact

on him.

It is not clear from the record why PFS decided not to adopt any LTIP. Longfield

adamantly denies telling Roeder that he could not adopt the LTIP because the deal with Scottish

Power was pending: "No . . . my refusal to recommend approval at the PacifiCorp level

remained in full force, and certainly it wouldn't make sense that notwithstanding my refusal to

present it to PacifiCorp that I would present it to a potential acquirer like Scottish Power."

Longfield Depo., p. 128. In addition, Longfield testified that although he was "supportive in

concept" of adopting a LTIP for Syn Fuel, "[t]he timing and nature of the deal were very much

up in the air." *Id*. However, Roeder recalls that Longfield told him that he could not deal with

compensation issues because "the Scotts are in here, you know, there's – you know, there's

things I can and can't do." Roeder Depo., p. 67. At this juncture when inferring all facts in

favor of Roeder, it is reasonable to infer from his testimony and the circumstances that the

pending merger caused PFS to defer or drop the idea of a LTIP for Syn Fuel. Thus, Roeder has

created a genuine issue of material fact as to whether the offer of a new compensation package constitutes a detrimental impact and, if so, whether such a detrimental impact was due to the imminent change in control.

### c.    "As a Result of"

The final requirement of the Severance Plan is that the voluntary resignation must have occurred as "a result of" the change in control.

Around July 1999, Roeder received a job offer from LECTRIX for the position of CFO. Although he was not very interested in the position because it appeared to involve a relocation to San Francisco, he ultimately accepted the LECTRIX offer because there was a lot of uncertainty at PacifiCorp, people were starting to be laid off, and he believed Scottish Power had no interest in Syn Fuel. He also acknowledges that he never had any concerns about his job duties and did not ask Longfield to change any of his job duties. Roeder Depo., p. 106. When asked what he would have done had the LECTRIX job prospect not happened, Roeder admitted that he "would have kept working at PacifiCorp." *Id* at 103. PFS latches onto this admission to demonstrate that Roeder did not resign due to the pending merger, but due to another job offer.

Although this admission is some evidence that Roeder did not resign as a result of the change in control, it is countered by other evidence. First, it is not clear how long Roeder would have stayed had he not accepted the LECTRIX job. Roeder believes that he would have been fired because "everybody else is gone." *Id* at 104. Based on that belief, he resigned rather than remain employed until he was fired due to a change in control. Second, Roeder explained that the LECTRIX job offer constituted a catalyst for discussions about the status of the LTIP, as well as the Severance Plan and its terms. He noticed that once the merger rumors started, PFS'

responses to inquiries about his eligibility for LTIP changed from "yes" to an ambiguous "let's wait and see." Based on this uncertainty caused by the imminent change in control and its potential impact on him, Roeder resigned. *Id* at 42-43. This evidence creates a fact issue as to the reason for Roeder's resignation.

### d. Conclusion

Roeder has created a genuine issue of material fact on whether he resigned as a result of the imminent change in control which had a detrimental impact on him. Therefore, PFS' motion for summary judgment against the breach of contract for payment of severance benefits on this ground is denied.

### 2. Material Change in Authority

### a. Allegation

Roeder also contends that he resigned as a result of suffering a material change in authority. PFS requests the court to disregard this contention because Roeder failed to allege it in his Complaint. The Complaint alleges in pertinent part:

> In or about October, 1999 Plaintiff terminated his employment because of Defendant's representation of its intent to materially alter Plaintiff's position: (1) Plaintiff's employment would be materially altered as a result of a pending merger with Scottish Power and (2) despite earlier promises to the contrary, the [LTIP] . . . would not be honored without significant alterations.

Complaint, ¶ 4.

///

///

This paragraph clearly alleges two reasons for Roeder's resignation: (1) an anticipated material change in position as a result of the pending merger; and (2) a material change in the

terms of employment by not honoring the proposed LTIP.  Because an anticipated material

change in *position* and/or in the *terms of employment* may equate with a material change in

*authority*, Roeder has sufficiently pled a claim for severance benefits based on a material change

in authority.  However, in his response to PFS' motion for summary judgment, Roeder relies on

his material changes in authority before the merger and does not address anticipated post-merger

changes in authority as pled in his Complaint.

**b.       "Material Change in Authority"**

Roeder contends that he is entitled to severance benefits because he experienced a

material change in authority when he moved from a financial desk job in Portland to becoming

president of Syn Fuel, spending half his time in Alabama, managing 45 employees and the

responsibility of making four coal plants operational in Alabama.

The first issue is whether only negative changes in authority, and not positive changes in

authority as experienced by Roeder, are covered by the Severance Plan.  Roeder argues that

since "material change" is not defined in the Severance Plan, it should be interpreted broadly as

encompassing both positive and negative changes, promotions and demotions.  However, such

an interpretation contravenes the purpose of the Severance Plan which, according to Roeder, was

implemented to retain executives at a time when the company was undergoing some downsizing.

As stated in the Severance Plan itself, its purpose was to "[p]rovide severance pay protection to

designated key executives in event of . . . significant employment alteration *to the detriment of*

*the executive* or during times of significant change (including change of control)."  Buchanan

Decl., Exhibit 9, p. 3 (emphasis added).  Thus, the Severance Plan clearly indicates an intent to

protect executives only from material changes in authority that are detrimental, rather than to protect them from being entrusted with greater authority.

Even so, Roeder contends that he experienced a detrimental change in authority by having to work longer hours, being away from his family 50% of the time, going from a financial desk job to a hands-on operations position with many challenges and with an increase in responsibility that was not accompanied by the commensurate compensation he was allegedly promised:

> It's just an incredibly difficult task to travel and be away from the family 50 percent of the time, when most of your career has been in a desk in Portland.  You know, I got the union trying to organize my folks out there in Alabama.  I've got guys going after them with two-by-fours.  I've got trucks going by at the front dumping nails.  I've got fights in bars.  I've got people pulling guns on me.  This is different from what I originally signed up for.

Roeder Depo., p. 43.

In response, PFS argues that Roeder did not suffer any detrimental change in the level of his *authority* because he never received a promotion or demotion, but continued in the same position both before and after the Severance Plan was implemented.  Instead, the job duties for a position he already held increased as Syn Fuel evolved.  PFS also argues that "authority" has a different meaning than working hard, and that the Severance Plan did not intend to allow executives to quit and receive severance whenever their jobs became more challenging than anticipated.  Instead, PFS urges the court to interpret "authority" as "[t]he right and power to command, enforce laws, exact obedience, determine or judge," citing *Webster's II New Riverside Univ. Dictionary*.  *See* Buchanan Reply Decl., Exhibit 5.

Roeder had lead responsibility for Syn Fuel after it was organized as a business in December 1996.  He conducted the preliminary evaluation on the viability of such a project, was instrumental in obtaining the Board's recommendation to invest and to buy out Covol, managed the construction of the first plant, and negotiated binding contracts on the construction of three more plants all before the end of 1996.  After the Severance Plan was implemented on February 21, 1997, and once the plants become operational, the number of people supervised by Roeder substantially increased.  Even under PFS' definition of authority as the "power to command," these changes caused an increase in Roeder's level of authority.

Although such an increase in authority is positive, Roeder states that it had a detrimental effect on the quality of his life by demanding longer hours, stress caused by dealing with employee problems, and significant travel which kept him away from his family half of the time with no offsetting increase in his level of compensation.  This is sufficient to create an issue of fact as to whether his change of authority was material and detrimental as required by the Severance Plan.

### c.    "As a Result of"

Even if Roeder suffered a detrimental and material change in his authority, he is not entitled to benefits under the Severance Plan unless he resigned as a result of that change.  To Roeder, the change in authority was detrimental and material because it was not accompanied by a compensation package commensurate with that change.  His resignation resulted from that failure.  Had PFS paid him what he thought his performance was worth, presumably he would not have resigned.  This is sufficient to create a fact issue as to the reason for his resignation.

///

**d.**    **Conclusion**

Roeder has created a genuine issue of material fact on whether he resigned as a result of the a material change in authority.  Therefore, PFS' motion for summary judgment against the breach of contract for payment of severance benefits on this ground is denied.

**II.**    **LTIP**

Roeder next alleges that PFS has breached his contract by failing to pay him benefits under the LTIP.  PFS moves for summary judgment on the grounds that the parties never formed an enforceable contract regarding the LTIP and that even if a contract was formed, Roeder did not qualify for payment at or before the time of his resignation.

**A.**    **Breach of Contract Claim**

**1.**    **Legal Standard**

Unlike the claim for severance benefits, PFS does not contend that the claim for LTIP benefits is governed by ERISA.  Therefore, Oregon law governs.

Oregon contract formation is a question of law.  *Key West Retaining Sys., Inc. v. Holm II, Inc.*, 185 Or App 182, 188, 59 P3d 1280, 1283 (2002), *rev. denied*, 335 Or 402, 68 P3d 231 (2003).  Oregon subscribes to the objective theory of contracts.  *Springer v. Powder Power Tool Corp.*, 220 Or 102, 110, 348 P2d 1112, 1115-16 (1960) (citations omitted).  "In determining whether a contract exists and what its terms are, we examine the parties' objective manifestations of intent, as evidenced by their communications and acts."  *Ken Hood Constr. v. Pacific Coast Constr.*, 201 Or app 568, 578, 120 P3d 6, 11 (2005), *adhered as modified on reconsideration by* 203 Or App 768, *rev. denied*, 341 Or 366 (2006).  "Contract formation

requires 'a bargain in which there is a manifestation of a mutual assent to the exchange and a consideration." *Id*, citing RESTATEMENT (SECOND) OF CONTRACTS § 17(1) (1981).

### 2.    Mutual Assent

PFS argues that Roeder has failed to establish mutual assent between the parties to a LTIP for Syn Fuel.  Roeder responds that both Longfield and Henderson, PFS officers and directors, promised him that PFS would adopt a LTIP.

### a.    Henderson

When asked what kind of promise Henderson had made him regarding the LTIP, Roeder testified as follows in his deposition:

> I spoke to Mike [Henderson] about the venture and about the compensation plans that we were putting in place.  And one key piece of it for me was the [proposed LTIP] or a chance to earn the EnergyWorks - like the long-term incentive plan stuff that we had talked about.  Because he and I were working on the EnergyWorks joint venture.  And he confirmed that was consistent with what we were going to do.

Roeder Depo., p. 71.

He did not remember Henderson's exact words, nor the exact dates of these conversations.  *Id* at 71-72.  Consistent with this deposition testimony, Roeder states in his declaration that he discussed the LTIP with Henderson, who "agreed that Syn Fuel, an unregulated venture, should be treated consistent with EnergyWorks with respect to a LTIP plan."  Roeder Decl., ¶ 28.

### b.    Longfield

Longfield told Roeder that the proposed LTIP "looked good to [him].  Go talk to Lea Ann Doolittle."  Roeder Depo., p. 70.  Roeder followed up with Doolittle.  When she commented:  "It looks like you could make a lot of money under plan," he responded:  "Well,

that was the idea, that the company made a lot of money; I can make a lot of money." *Id*.  He

cannot remember what else, if anything, Doolittle said to him and admits they never had a formal

meeting about the proposed LTIP.  *Id* at 70-71.  In fact, Roeder expressed his frustration with the

"continuing theme" he faced in that he "didn't get much of a response from anybody with

respect to any portion of [his] compensation," which led to a lot of uncertainty.  *Id*.

Roeder knew as late as April 1998 that the LTIP had not been implemented.  In an April

1998 letter offering J. R. Key a job as a manager for the Syn Fuel plants, Roeder included a

description of the LTIP as part of the compensation package, noting that it was not yet final and

approved by the Board.  Roeder recalls a conversation with Longfield where he "continued to

push to get something in writing" so that he could "get back to guys like J.R. Key."  Roeder

Depo., p. 67.  In his mind, "there was no argument about whether or not there was going to be a

plan.  There was going to be a plan," but the "details had to get worked out, like I said.  But we

had a deal." *Id*.  As he "pushed harder," Longfield eventually told him:

> Look, the Scotts are in here, you know, there's - - you know, there's
> things I can and can't do.  Compensation will take care of itself.  You go
> and continue to build the value in this entity.  He said I had bigger
> problems in Alabama that I need to work out.  So I said okay, I'll go back
> and work hard.

*Id.*

In the context of discussions about the proposed LTIP, Longfield told Roeder to "go back

and work hard."  Roeder Depo., p. 69.  Roeder understood that he had a deal: if "I go work hard;

I build huge value for the company; they're going to pay me for it." *Id*.  Roeder believed PFS

would pay him along the lines of the LTIP he had proposed: "[a]s it was cash flowing, I'd get

paid." *Id* at 70.

This testimony is consistent with Roeder's declaration in which he asserts that on several occasions in 1998, while heavily engaged in getting the plants in service by the June deadline, Longfield assured him that the LTIP would be implemented consistent with PacifiCorp's other nonregulated ventures.  Roeder Decl., ¶ 34.

In his deposition, Longfield confirms that he was interested in adopting some kind of LTIP for Syn Fuel:

> Q. Did you indicate to Mr. Roeder at any time from November of '97 through the first part of 1998 that you would be in favor of getting a [LTIP] finalized, or any words to that effect?
> A. It was certainly my interest in getting at the appropriate time a [LTIP] adopted for the Syn Fuel business. And I think I'd been in all our discussions with respect to this topic *supportive in concept* of doing that. The timing and nature of the deal were very much up in the air.

Longfield Depo., pp. 127-28 (emphasis added).

However, Longfield also indicated to Roeder that he was "not prepared to recommend approval of any [LTIP] at this time.  Notwithstanding that, [he] was not prepared to move forward without significant discussions as to kind of the specific characteristics and attributes of what [Roeder] had recommended."  *Id* at 126-27.  Furthermore, he was not prepared to recommend the LTIP for Syn Fuel to the Board "until such time as the performance of the Syn Fuel operation was consistent with what we had told the board we would be capable of doing."  *Id* at 110-11.

///

///

### c.    O'Brien

O'Brien, the third member of the Board, never made Roeder any promises about adopting the proposed LTIP, but confirms that he "felt like we probably should put something in place for those people who stuck it out long enough to, you know, ultimately get value from the business, however we were going to do that." O'Brien Depo., pp. 46-50. O'Brien admitted that his "normal path" would have been to defer any Roeder compensation issues to Longfield, who was Roeder's boss, "and to the extent that [Longfield] had any issues, [O'Brien] would have made sure that he was referred to Leanne Doolittle." *Id* at 56.

### d.    **Analysis**

Viewing the facts in the light most favorable to Roeder, Henderson agreed to adopt a LTIP for Syn Fuel similar to the EnergyWorks, without promising when that would happen. Longfield promised to adopt some form of a LTIP similar to the other LTIPs adopted by PacifiCorp at some indefinite time, and stated that Roeder's LTIP proposal looked good to him. O'Brien made no promises, but also anticipated adopting a LTIP and deferred to Longfield. Even so, Roeder was clearly told to take his LTIP proposal to Doolittle, but failed to ever have a formal meeting about it with her. Roeder also admitted that the LTIP for Syn Fuel needed to be approved by the PFS Board and is unaware of the Board ever approving it.

Thus, at best, the evidence supports the conclusion that PFS made a promise to Roeder, which he accepted, to adopt a LTIP at some point in the future along the lines of his proposal. However, the Board never approved Roeder's proposed LTIP or any other LTIP for Syn Fuel. Absent Board approval, Roeder only had an agreement to agree without the mutual assent necessary to form a contract.

### 3.    **Indefinite Terms**

Roeder's breach of contract claim for LTIP benefits also fails for another reason, namely that it is not sufficiently definite to be enforceable.

The proposed LTIP contains some very definite "draft key terms."  Buchanan Decl., Exhibit 7, p. 3.  It provides that the participants will be set by the PFS Board but will initially consist of the President and Vice President of Operations, creates a pool to be "funded by 5% of the after-tax profits" with a formula for calculating those profits, and sets the initial allocations of semi-annual payouts of the pool to the participants nominated for participation (with 40% paid to Roeder).

With respect to other terms, Roeder points to the LTIP for EnergyWorks as guidance.  As set forth in his proposal, the LTIP was to be consistent with the LTIPs of PacifiCorp's other ventures, including Energy Works and INSPECT.  However, the LTIP for EnergyWorks is not in the record and, thus, cannot supply whatever omitted terms might be material.  Furthermore, the proposal contains the following caveat:

> Because [Syn Fuels] are pass-through entities for tax purposes that can only recognize value in the form of tax credits or the syndication of tax credits, an eventual realization of that value through an IPO or private sale similar to EnergyWorks and INSPECT is not possible.

*Id*.

In other words, Roeder expected that the LTIP for Syn Fuel would be different from the LTIP for EnergyWorks because its primary purpose was to obtain tax relief, rather than to gain profit.  How it would differ is not clear from the record.

Roeder also acknowledges that it was possible that PFS would decide on different terms than the ones in his proposed LTIP, such as different percentage allocations to the bonus pool. Roeder Depo., pp. 82-83.  Longfield was not prepared to make the recommendation "without

significant discussions as to [the] kind of the specific characteristics and attributes of what [Roeder] had recommended." Longfield Depo., pp. 126-27.

In addition, it is not clear when the payouts would occur. Roeder thought they would happen when Syn Fuel would have cash flow. Longfield expected payouts when Syn Fuel would reach the level of performance promised to the PFS Board, but the record does not reveal what level was promised. In a memorandum to O'Brien in November 1999, Longfield outlined Syn Fuel's earnings from September to November 1999 and recommended some bonuses to be paid to J. R. Key and others. Roeder believes this proves that the level promised to the Board was reached. However, Longfield was not willing to recommend approval of the LTIP for Syn Fuel to the Board "until such time as the performance of the Syn Fuel operation was consistent with what we had told the board we would be capable of doing." Longfield Depo., pp. 110-11. He was interested in getting a LTIP adopted for the Syn Fuel business "at the appropriate time," but the timing and nature of the deal "were very much up in the air." *Id* at 128. According to Longfield, Syn Fuel was still not performing at that level and would not perform at that level until the 2001 sale. In fact, Syn Fuel would not have reached the point where a payout would result until it was sold to Marriott in 2001 for $200 million. *Id* at 63.

Thus, had the LTIP been adopted as proposed by Roeder, it is far from clear that it would have produced any payouts by November 1999 when Roeder left. Roeder Depo., p. 62. In fact, under Roeder's proposed LTIP, "terminated employees, or employees who had resigned" would not be entitled to payouts. *Id* at 63-64.

Based solely on the terms set forth in Roeder's LTIP proposal, it is too indefinite to enforce. Too many terms are uncertain or left to future determination by the PFS Board. Based

on these reasons, Roeder had no enforceable LTIP.  Accordingly PFS is entitled to summary

judgment against the breach of contract claim for LTIP benefits.

     **B.**    **Promissory Estoppel**

      **1.**    **Allegations**

       Roeder did not specifically allege a promissory estoppel claim in his Complaint.

However, in opposition to PFS' motion, he argues that promissory estoppel prevents PFS from

refusing to pay the LTIP.  This court generally does not consider a new claim on summary

judgment absent amendment of the pleadings.  However, the allegations in paragraphs 7-11 of

the Complaint are sufficient to allege a promissory estoppel claim, even though they are included

as part of the First Claim for breach of contract.  "In Oregon, promissory estoppel is not a 'cause

of action' in itself, but is a subset of and a theory of recovery in breach of contract actions."

*Neiss v. Ehlers*, 135 Or App 218, 227-28, 899 P2d 700, 706 (1995) (citations omitted).

Consideration of a promissory estoppel theory is based on the same facts as the breach of

contract claim and does not prejudice PFS.  Therefore, this court will construe paragraphs 7-11

to allege a claim for promissory estoppel.

///

///

///

      **2.**    **Legal Standard**

       The promissory estoppel doctrine, as set forth in the RESTATEMENT OF CONTRACTS, § 90,

was adopted by the Oregon Supreme Court in *Schafer v. Fraser*, 206 Or 446, 468-81, 290 P2d

190, 200-06 (1955), *subsequent order at* 294 P2d 609 (1956).  The elements of promissory

estoppel are: "(1) a promise (2) which the promisor, as a reasonable person, could foresee would induce conduct of the kind which occurred, (3) actual reliance on the promise, (4) resulting in a substantial damage in position." *Bixler v. First Nat'l Bank*, 49 Or App 195, 199-200, 619 P2d 895, 898-99 (1980).

### 3.    Analysis

As discussed above, two of the three PFS board members, Longfield and Henderson, promised Roeder that the LTIP would be made part of his compensation for his efforts with respect to Syn Fuel, and the third board member deferred to Longfield. Roeder relied on those promises in deciding to accept the task of getting the plants in service by the deadlines and then continuing to manage the operations of four plants in Alabama, responsibilities which kept him away from his family in excess of 50% of his time. PSF never implemented a LTIP for Syn Fuel despite providing that assurance to Roeder.

As discussed above, the promise made to Roeder was an agreement to agree and too indefinite or incomplete for enforcement as a contract. However, promissory estoppel can salvage indefinite contracts. After considering conflicting case law from other jurisdictions, Oregon has concluded "that promissory estoppel can apply, under appropriate circumstances, to promises that are indefinite or incomplete, including agreements to agree." *Neiss*, 135 Or App at 228, 899 P2d at 707. That conclusion is based on two reasons. First, "promissory estoppel remedies are more flexible in nature than contract remedies and are aimed at compensating the promisee for damages that result from actions in reliance on the promise, rather than providing comprehensive contract relief for the breach of the indefinite promise itself." *Id*. The second and related reason is that the "evil to be rectified through promissory estoppel is not the breach

of the promise, but the harm that results from the promisor's inducement and the promisee's action in reliance." *Id*, 135 Or App at 229, 899 P2d at 707.

In *Neiss,* an optician was promised by her former employer a one-third ownership interest in consideration of her skills and contributions. Although the promise was too indefinite to enforce as a contract, the court allowed the theory of promissory estoppel to provide some relief. The facts here are parallel to those in *Neiss.* Although the LTIP is too indefinite to be an enforceable contract, Roeder could reasonably have acted on PFS' promise to adopt a LTIP similar to the one he proposed by continuing to work on the Syn Fuel project, and PFS could have foreseen that its promise would induce Roeder to remain employed until Syn Fuel was up and running.

Thus, PFS is not entitled to summary judgment against the promissory estoppel theory in connection with the LTIP. It must be noted, however, that if Roeder prevails on this theory, his damages will be limited to those suffered in reliance on the promise made, and will not equal the benefits which he claims are due under his proposed LTIP.

## III.    **Annual Bonus Plan**

Roeder also seeks benefits under the Annual Bonus Plan which PFS implemented in April 1997. The plan required that the participant be actively employed by PFS on December 31 of the plan year to receive the bonus. Roeder Depo., Exhibit 15. Unlike *Wyss*, where the executive had worked the entire year and the plan did not require the executive to be employed on the day of the disbursements, the terms of the Annual Bonus Plan clearly required the participant to be actively employed on December 31 of the plan year. Roeder left PFS before December 31, 1999.

34 - OPINION AND ORDER

Despite this express requirement, it was Roeder's understanding that PFS "guaranteed the short-term incentive plans as part of the merger with Scottish Power. When that closed, everybody got their target award." Roeder Depo., p. 127. Roeder did not stay until the merger closed. Therefore, Roeder admitted at oral argument that this guarantee would apply to him only if he prevails on his claim that PFS repudiated the LTIP. Since there was no enforceable LTIP contract, PFS could not have repudiated the LTIP. At best, Roeder has a claim for reliance damages under a promissory estoppel theory for PFS' failure to adopt a LTIP for Syn Fuel.

Accordingly, PFS is entitled to summary judgment against Roeder's breach of contract claim for a bonus for 1999.

## IV.    ORS 652.140

PFS argues for dismissal of Roeder's claim under Oregon's wage and hour laws, ORS 652.140, based on its defenses to his breach of contract claims. ORS 652.140(2)(a) provides as follows:

> When an employee who does not have a contract for a definite period quits employment, all wages earned and unpaid at the time of quitting become due and payable immediately if the employee has given to the employer not less than 48 hours' notice . . . of intention to quit employment.

Roeder's cause of action for violation of ORS 652.140 is based entirely on his claim that PFS owes him money under the LTIP, Severance Plan, and Annual Bonus Plan. As each of these claims fails, so does his claim for violation of ORS 652.140. Roeder has not prevailed on his breach of contract claim for LTIP benefits or payment of a bonus for 1999. Thus, this claim for violation of ORS 652.140 survives only as to Roeder's claim for breach of contract for severance benefits.

## **ORDER**

Accordingly, PFS' Motion for Summary Judgment (docket # 24) is DENIED in part and GRANTED in part as follows:

(1)  DENIED as to the:

      (a)  First Claim for breach of contract as to severance benefits;

      (b)  Second Claim for violation of ORS 652.140 as to severance benefits; and

      (c)  Claim for promissory estoppel based on failure to adopt a LTIP as promised;

(2)  GRANTED as to the:

      (a)  First Claim for breach of contract as to LTIP benefits and an annual bonus for 1999; and

      (b)  Second Claim for violation of ORS 652.140 as to LTIP benefits and an annual bonus for 1999.

DATED this 27th day of October, 2006.

                       /s/ Janice M. Stewart
                       Janice M. Stewart
                       United States Magistrate Judge